LEE SHUBERT et al., Plaintiffs, *v.* COLUMBIA PICTURES CORPORATION, Defendant.

Supreme Court, Special Term, New York County, June 7, 1947.

*Charles H. Tuttle, William Klein* and *Milton R. Weir* for plaintiffs.

*Louis D. Frohlich, Lawrence C. Gibbs* and *Everett A. Frohlich* for defendant.

McNALLY, J. Plaintiffs bring this action for an injunction prohibiting and restraining defendant from distributing or exhibiting a certain motion picture called '' The Jolson Story '', and for an accounting by defendant of all profits realized by reason of the exhibition of the picture, plus a judgment against the defendant in the sum of $500,000 as damages which plaintiffs have allegedly sustained.

The complaint alleges that the plaintiff Trebuhs Realty Company, Inc., is the owner of the Winter Garden Theatre in New York City, which theatre has become known to the general public as one of the greatest show places in the nation; that the plaintiffs Lee Shubert and Jacob J. Shubert control the Trebuhs Realty Company, Inc., and are actively engaged in its management; that the Winter Garden Theatre possesses a widespread reputation in connection with its presentation of theatrical plays, musical comedies and other types of entertainment, and enjoys a valuable good will in connection with the presentation of said entertainment; and that the association between the plaintiffs and the Winter.Garden is inseparable in the minds of the general public throughout this country. The complaint further alleges that the defendant, Columbia Pictures Corporation has produced a motion picture entitled '' The Jolson Story '', which motion picture purports to be a biographical study of the life of the singer and comedian Al Jolson; that the motion picture runs for over two hours; that for a considerable period of this running time it purports to show the Winter Garden Theatre, both interior and exterior, as well as the famous runway known as '' the bridge of thighs '', consisting of an extension and elongation of the stage throughout the orchestra; that the motion picture purports to show a large number of plays produced by the individual plaintiffs and their affiliated companies in which the said Al Jolson appeared and played a promi-

nent role. The complaint further alleges that the defendant has caused to be published a circular containing a synopsis describing the story of the motion picture, which synopsis is annexed to the complaint and marked Exhibit A. As shown by the synopsis, the name " Shubert " is mentioned in two instances — once in connection with the identification of one Baron who is stated to have become manager for the Shuberts and again in connection with the identification of the individuals who first opened the Winter Garden Theatre. The complaint states that numerous persons who will see " The Jolson Story " will believe they are viewing scenes of the Winter Garden and that many of the scenes depicted in the motion picture were taken in the Winter Garden and that they will further believe such scenes have been approved and authorized by the plaintiffs, as well as the use of the name " Winter Garden " and the names of the individual plaintiffs in the circular. The complaint further states that " The Jolson Story " does not contain any scenes actually taken in the Winter Garden, and alleges that for a number of years prior to the making of " The Jolson Story " plaintiffs offered the defendant and other prominent motion-picture manufacturers the right to use the name " Winter Garden " as a title for a motion picture and for a story depicting the " Winter Garden " and the rise and progress thereof; that such rights were valuable property rights and that defendant misappropriated the rights as part of a conspiracy to enhance the popularity of the play " The Jolson Story " and to increase the revenue which the defendant expects to derive from the distribution thereof; that the acts were done fraudulently with the intention of deceiving the public and with consequent injury to the plaintiffs, who have been deprived of the opportunity of selling the title and the story of the rise and progress of the Winter Garden and to receive substantial sums of money as a result thereof.

The defendant's answer is substantially a general denial.

The defendant's motion picture, " The Jolson Story ", which is in evidence, portrays Jolson originally as a young boy singing in a synagogue choir, and shows his contact and interest in the theatre. It shows him as a singer in a vaudeville team, first singing from the audience, and later, singing on the stage. It shows his progress in vaudeville, and later in Dockstadter's Minstrels. It portrays his coming into the theatre as an unknown artist and becoming an overnight sensation at the Winter Garden. He plays in a number of successful musical comedies in that theatre over a period of years. It shows him

meeting a girl at the Winter Garden; he marries her; they both make pictures in Hollywood; their home life is disrupted by the routine of picture production and unhappiness results. Jolson is depicted as retiring from the screen, and then his wife, sensing her inability to hold him, forces him back to the stage and walks out of his life. Jolson's role is portrayed by a motion-picture actor named Larry Parks. It is Parks who carries the acting and the dialogue and goes through the motions of singing the Jolson songs, but it is Jolson who actually sings these songs, Parks and Jolson's voice having been synchronized so they present an illusion to the audience. Some of the songs which Jolson sings are represented as being sung in the Winter Garden of twenty years ago or more, and there can be no question the audience is seeing Jolson in the course of singing his songs of that era. There are several shots showing the front of the Winter Garden, with the words " Winter Garden " on it. These shots were made in the defendant's studio in Hollywood. There are shots also of the backstage interiors, as well as the stage and runway of the Winter Garden, and these shots were likewise made in defendant's studio in Hollywood.

The plaintiffs contend that they have lost an opportunity to sell a story based on the Winter Garden by reason of the defendant's production of the motion picture, and that the picture idea of " The Jolson Story " originated in a manuscript prepared by one Morehouse, who was hired for that particular purpose by the plaintiffs.

In order for the plaintiffs to make out a case of unfair competition, the proof must show the existence of a property right, plaintiffs' ownership of that property right, and a misappropriation of that property right by the defendant, or at least a deception of the public occasioning damages to the plaintiffs.

The court holds that notwithstanding plaintiffs' assertion that they own the good will in and to the Winter Garden Theatre, and that said good will had been appropriated by defendant, that plaintiffs do not possess any present property right in the name " Winter Garden ", nor did they possess any such property right on October 10, 1946, the date on which the motion picture " The Jolson Story " was first exhibited to the general public.

Mr. Jacob J. Shubert, one of the plaintiffs, testified that since 1945 each of the lessees — United Artists Corporation, United World Pictures Company, Inc., and Universal Pictures Company, Inc.— of the Winter Garden, had used the name Winter Garden, and that the plaintiffs themselves have not used the same. His testimony in that respect is as follows:

"Q Since 1945 who used the name Winter Garden? A The people in the pictures.

Q Trebuhs Realty Co. has not used it? A No.

Q Jake and Lee Shubert have not used it? A No.

Q It has been only by the picture companies whose pictures appear at the Winter Garden? A Yes.

Q Both in New York and outside of New York? A Yes."

On redirect examination, Mr. Shubert stated:

"Q You had been asked about the lease made in 1945 of the Winter Garden for motion picture purposes, and about these pictures being taken to other theatres later and being advertised there as pictures shown in the Winter Garden? A Yes.

Q Was that a privilege that was part of the $1,000 a day they paid for the Winter Garden, plus 2%? A Yes. They should get something for their money."

The testimony further shows that in return for the rent received for the Winter Garden, the respective lessees were given the sole right to use the name "Winter Garden" in connection with the exploitation of their motion pictures both in New York City and elsewhere. Whether or not plaintiffs specifically granted their lessees the right to use the name Winter Garden is immaterial. For the good will of a public building, such as a theatre or hotel, runs with the building, and that good will passes with the lease of the building to the lessee and cannot be severed therefrom even by its first adopter and user. (*Mitchell* v. *Read,* 19 Hun 418, affd. 84 N. Y. 556; *People ex rel. Johnson Co.* v. *Roberts,* 159 N. Y. 70, 81; *Booth* v. *Jarrett,* 52 How. Prac. 169.) Since the plaintiffs do not have any present interest in the good will that may have attached to their theatre, they cannot reasonably contend that any property right of theirs has been misappropriated. The plaintiffs rely heavily upon the case of *Madison Square Garden Corp.* v. *Universal Pictures Co.* (255 App. Div. 459); and, assuming for the purpose of argument that plaintiffs have a present property right in the good will of the name "Winter Garden", this case does not help them, because the testimony shows that they have never engaged in the business of licensing the right to take motion pictures of the interior or exterior of the Winter Garden. In the *Madison Square Garden* case (*supra*), the plaintiff actually did engage in the business of licensing the taking of motion pictures in Madison Square Garden, and it was that property right which was alleged to have been misappropriated by the defendant. In the case at bar, plaintiffs are not and never have been engaged in any such business.

It is plaintiffs' position that notwithstanding the many shows that were presented at the Winter Garden prior to its conversion into a motion-picture house — covering a period of forty-five years — that a motion picture showing Jolson performing at the Winter Garden in the shows in which he appeared there, has destroyed the possibility of producing a motion picture concerning the history of that theatre and the personalities who appeared in the shows which were produced there. A partial list of those shows and performers fills some nine pages of the record. Notwithstanding this fact, plaintiffs contend that a motion picture based upon or incorporating excerpts from any of the plays or starring any of the performers who appeared at the Winter Garden could no longer be produced. It is impossible for the court to accept plaintiffs' theory that, as a result of "The Jolson Story", a picture based upon the plays which took place in the Winter Garden, whether bearing the title "Winter Garden" or some other title, and using the talent of ex-Winter Garden stars, could not be produced as a box-office or entertainment success.

It is quite apparent that the public was not deceived into believing that scenes actually filmed in the Winter Garden were being exhibited. It is equally clear that the public was not deceived into believing that it was viewing attractions currently being presented at the Winter Garden. The songs that Jolson sings in the picture were the songs that he had sung on the stage of the Winter Garden over twenty years ago. Since the proof shows that Jolson went to Hollywood to make the first talking picture in the year 1928, no scenes purporting to have taken place in the Winter Garden before Jolson went to California could have taken place subsequent to 1928. The fact, also, of the presence of the actor Parks in the motion picture furnishes conclusive proof that there was no possibility of deception. No one contends that he is a product of the Winter Garden, and the entire picture itself clearly convinces the court that any assertion that defendant's picture deceived the public is untenable. The picture is not a picture of the Winter Garden as the plaintiffs contend; it is a picture based on purported episodes in the life of Jolson and whether the episodes are true or fictitious is immaterial.

The running time of the picture is two hours and eight minutes: the plaintiffs contend that the Winter Garden is "show cased" for twenty-nine and one-half minutes while the defendant's position is that the sequences having to do with the Winter Garden (including marquee, audience, stage, wings and backstage shots)

total a running time of sixteen and eight-tenths minutes. The court finds the defendant's contention in this regard to be a fact. Even if the plaintiffs' computation is the correct one, it does not alter the court's conclusion that the Winter Garden sequences are only by way of background for the particular scene portrayed and to the main theme.

The defendant offered testimony that it had spent or committed itself to spend approximately $750,000 for domestic and foreign advertising of the motion picture " The Jolson Story ", and that this advertising matter was designed to reach approximately a hundred million people. The newspaper and advertising material offered in evidence demonstrates that no attempt was made by the advertisers to trade on the name of the Winter Garden. It is true that in the synopsis distributed to exhibitors there are some references to the Winter Garden. It is also true that certain " stills " bear upon the reverse side thereof legends containing the name " Winter Garden ". There is no evidence, however, that the defendant distributed either the synopsis or the stills to the general public.

With reference to plaintiffs' claim of the appropriation of an idea, it must be borne in mind that there is no property right in an idea as such, but only in the expression of the idea (*Fendler* v. *Morosco*, 253 N. Y. 281; *Dymow* v. *Bolton*, 11 F. 2d 690; *O'Brien* v. *RKO Radio Pictures, Inc.*, 68 F. Supp. 13; *Futter* v. *Paramount Pictures*, 69 N. Y. S. 2d 438), and that, in the absence of a fiduciary or contractual relationship, any person can use the ideas divulged to him by another (*Moore* v. *Ford Motor Co.*, 28 F. 2d 529, affd. 43 F. 2d 685; *Bristol* v. *Equitable Life Assur. Society*, 132 N. Y. 264; *Soule* v. *Bon Ami Co.*, 201 App. Div. 794, affd. 235 N. Y. 609; *Grombach Productions, Inc.* v. *Waring*, 293 N. Y. 609).

With reference to the specific contention that the defendant appropriated a story written by one Morehouse entitled " Winter Garden ", the court has read the story, and while there is no specific allegation of literary piracy in the complaint, the court holds there is not the slightest resemblance between the Morehouse story " Winter Garden " and " The Jolson Story ". The Morehouse story is a story about one Avis Lyle, her numerous husbands, her experiences in New York, London and Hollywood, and finally the rise to fame of her young daughter, Willette. To the extent that Jolson's name appears in the manuscript, it is only one of the dozens of names of prominent people who are incidentally mentioned in passing. He plays no active part in the script. Morehouse was paid $750 by the

plaintiffs for the story. Subsequently, the plaintiffs submitted the manuscript to Warner Brothers, who rejected it. Defendant also rejected it. As a matter of fact, when the plaintiffs commissioned two of their witnesses to go to Hollywood to arrange with some motion-picture company to make a picture based upon the Winter Garden, the Morehouse manuscript was not given them, nor was it shown to them.

With reference to the aspect of the case concerning the negotiations by the plaintiffs' witnesses in Hollywood, and the reference made to the possible sale of a play concerning the Winter Garden, suffice it to say that in view of the stipulated testimony of Goetz and Hyde, the court finds the version of the defendant's witnesses in that regard presents the true events that transpired. It is quite evident that Goetz was willing to discuss a deal on condition that, in addition to the title "Winter Garden", his company would have the right to produce any part of titles, sketches, scenes, plots, music, lyrics, costumes, stage settings, etc., from plays, musicals, operettas, spectacles, etc., that had played at the Winter Garden Theatre, New York. Apparently the plaintiffs were never able to meet Goetz' requirements, and nothing ever came of his proposition; and the court finds as a fact that that is the only proposition that ever was made to plaintiffs' witnesses.

With reference to plaintiff's cause of action for the invasion of the right of privacy, section 50 of the Civil Rights Law grants a living person the right to prevent others from using his name, portrait or picture for advertising purposes or for purpose of trade. Plaintiff Trebuhs Realty Company, Inc., the owner of the Winter Garden Theatre, does not come within the statutory category of a living person. The court holds that the mention of the name "Shubert" in the press-book synopsis is merely incidental, and is not used for advertising purposes or for purposes of trade. Nowhere in the motion picture is either of the plaintiffs Shubert mentioned or is their name suggested. The incidental and inconsequential manner in which the Shubert name is used in the press-book issued to motion-picture exhibitors does not give rise to a cause of action in this regard (*Damron* v. *Doubleday, Doran & Co., Inc.*, 133 Misc. 302, affd. 226 App. Div. 796; *Martin* v. *New Metropolitan Fiction, Inc.*, 139 Misc. 290, affd. 234 App. Div. 904).

The plaintiffs have failed to establish their cause of action and the defendant is entitled to judgment-dismissing the complaint on the merits with an appropriate exception to the plaintiffs. Submit judgment accordingly.