OPINION OF THE COURT
Norman C. Ryp, J.
a. ISSUES
“Y”, as in “Wyndham”, is a crooked letter, consistent with its 1450 English origin, history, geography and genealogy! “I”, as in ‘Windham”, is a straight letter and self-possessive pronoun consistent with the parties’ battle for exclusive use of its name and mark in the middle east of Manhattan. The exclusive use of the Wyndham” (also known as Windham) name and mark are common, but competitive, objects in this complex intellectual property battle since 1992. It links a “world famous” family hotel, sited in Manhattan, with a north and central American hotel chain, based in Texas, with issues of novel impression. Such includes: Whether unsolicited or celebrity media coverage, sales success, length and exclusivity of use and likelihood of confusion show sufficient secondary meaning to the name Wyndham”.
B. PROCEDURAL HISTORY AND FACTS, C. HISTORY, D. PARTIES’ contentions and e. the trial are set forth in the filed decision and order and edited for publication.
F. DISCUSSION, APPLICABLE LAW AND FINDINGS
As noted in this court’s decision/order dated August 12, 1996 (affd 236 AD2d 220 [1st Dept 1997]), the name Wyndham” is a surname and a geographic term, though not extensively or primarily, but sufficiently to raise the issue of “secondary meaning”. The traditional factors include: (1) advertising expenditures; (2) consumer surveys; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) length and exclusivity of use. (See, Centaur Communications v A/S/M Communications, 830 F2d 1217, 1223 [2d Cir 1987].) Plaintiffs’ proof was very strong on factor numbers 3, 4 and 6 (19-20 years) above, moderate on factor number 5, and weak on factor numbers 1 and 2. (See, 124, infra.)
However, according to recent case law, secondary meaning may be obviated for injunctive relief under the Lanham Act (15 *118 USC § 1051 et seq.; § 1114 [1]; § 1125 [a]) where there is a likelihood of, if not actual, confusion. (See, Polaroid Corp. v Polarad Elecs. Corp., 287 F2d 492 [2d Cir 1961], cert denied 368 US 820 [1961]; Resource Developers v Statute of Liberty-Ellis Is. Found., 926 F2d 134 [2d Cir 1991].) As Professor J. Thomas McCarthy observes, “secondary meaning and likelihood of buyer confusion, although two separate legal issues, will be difficult to distinguish in viewing the evidence.” (2 McCarthy, Trademarks and Unfair Competition § 15.03.) Thus, “[p]roof of instances of actual confusion of buyers may suffice either to prove the existence of secondary meaning, or may itself be sufficient to warrant judicial relief without even considering secondary meaning” (2, 3 McCarthy, Trademarks and Unfair Competition § 15.04 [4] [b]; § 23.02 [1] [4th ed 1997]), or at common law (Allied Maintenance Corp. v Allied Mech. Trades, 42 NY2d 538, 543 [1977]).
Numerous American courts have previously recognized the interdependence between secondary meaning and confusion, finding evidence of one the equivalent of the other. (See, e.g., Interpace Corp. v Lapp, Inc., 721 F2d 460, 465 [3d Cir 1983] [“proof of one is proof of the other”]; American Scientific Chem. v American Hosp. Supply Corp., 690 F2d 791, 793 [9th Cir 1982] [“actual confusion is an indicium of secondary meaning”].)
Moreover, where it is shown that a defendant did not adopt its mark in “good faith”, as shown here, proof of secondary meaning is not required to obtain relief for common-law unfair competition. (Coach Leatherware Co. v AnnTaylor, Inc., 933 F2d 162, 169 [2d Cir 1991] [reaffirming the rule that a showing of secondary meaning is not necessary to prove unfair competition under New York common law]; Perfect Fit Indus, v Acme Quilting Co., 618 F2d 950, 953-954 [2d Cir 1980], cert denied 459 US 832 [1982].)
Polaroid (287 F2d 492, 495, supra) sets forth a still applicable balancing test with respect to “likelihood of confusion” of the following eight factors, including the: (1) strength of the mark; (2) degree of similarity between the two marks; (3) proximity of the products; (4) likelihood the senior user of the mark (or prior owner) will bridge the gap; (5) evidence of actual confusion; (6) junior user’s evidence of bad faith (or reciprocal of its good faith) in adopting the mark; (7) quality of the junior user’s mark and/or product; and (8) sophistication of the relevant consumer’s group (buyers). (See, Estee Lauder, Inc. v The Gap, 108 F3d 1503 [2d Cir 1997].)
*119 No one of the Polaroid factors is dispositive, and the list is not exhaustive; “the analysis of the factors is ‘not a mechanical process.’ ” (Arrow Fastener Co. v Stanley Works, 59 F3d 384, 391 [2d Cir 1995]; see, Gruner + Jahr USA Publ. v Meredith Corp., 991 F2d 1072,1077 [2d Cir 1993].) A trial court’s finding as to each factor is one of fact, subject to review for a clearly erroneous standard.
1. Strength of the Mark
The strength of a mark is “the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source”, “or its ‘origin-indicating’ quality, in the eyes of the purchasing public.” (McGregor-Daniger Inc. v Drizzle Inc., 599 F2d 1126, 1131 [2d Cir 1979].) Its assessment uses two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace. (W.W.W. Pharm. Co. v Gillette Co., 984 F2d 567, 572 [2d Cir 1993].) “ ‘[Sjtrength’ * * * ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.” (Restatement [Third] of Unfair Competition § 21, comment i [1995].)
In Abercrombie & Fitch Co. v Hunting World (537 F2d 4, 9 [2d Cir 1976]), Judge Henry J. Friendly, to gauge the inherent distinctiveness of a mark, created a spectrum of trademark protection into four categories, ranging from least to most protection under the Lanham Act: (1) generic — a common description of goods and never protected; (2) descriptive— describes the product’s features, qualities or ingredients in ordinary language protected only with secondary meaning; (3) suggestive — uses terms which do not describe but merely suggest the features of the product; it requires the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods; it signifies to the public the generic name other than the source of a particular brand of that article and is protected without proof of secondary meaning; (4) arbitrary or fanciful — always protected without proof of secondary or dictionary meaning and with ease of establishing infringement. (Abercrombie & Fitch Co. v Hunting World, supra, at 11; see also, Gruner + Jahr USA Publ. v Meredith Corp., supra, at 1075-1076.)
“Where the products * * * are competitive and the marks quite similar * * * the senior user of a more-than-descriptive mark need not prove secondary meaning.” (McGregor-Doniger *120 Inc. v Drizzle Inc., supra, at 1132; American Home Prods, v Johnson Chem. Co., 589 F2d 103, 106 [2d Cir 1978].) Surely the Mados Wyndham Hotel has an arbitrary or fanciful mark and is protected without secondary meaning. The court finds, in fact and law, ‘Wyndham” is suggestive of England and English and European architecture, decor, elegance and style which attracts celebrity guests such as Sir Lawrence Olivier, Joan Plowright, Sir Alec Guinness, Peter O’Toole, Glenda Jackson, Peter Ustinov and anglophiles such as Gore Vidal, Hume Cronin, Jessica Tandy, Harold Pinter, Vincent Price, Julie Harris and many American authors and stars of stage and screen.
2. Similarity of Marks
The pertinent inquiry on this factor is “the general impression conveyed to the purchasing public by the respective marks” (C.L.A.S.S. Promotions v D.S. Mags., 753 F2d 14, 18 [2d Cir 1985]); and whether the similarity of the marks, if any, is likely to provoke confusion among potential customers, considering all factors which the buyer will likely perceive or remember. (McGregor-Doniger Inc. v Drizzle Inc., supra, at 1133.) It looks to “the nature of the products themselves and the structure of the relevant market” which include the class of customers to whom sold, the manner of advertisement and the channels through which the goods are sold. (Vittaroz v Borden, Inc., 644 F2d 960, 967 [2d Cir 1981]; see, factor No. 8, infra.)
The names “Wyndham Hotel” are identical in the identical business, though with differing size, style (i.e., garden or resort) and market.
3. Proximity of the Products
This prong concerns whether, and to what extent, the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar descriptions is more likely to cause confusion. (Lang v Retirement Publ. Co., 949 F2d 576, 582 [2d Cir 1991].) The concern represented by the proximity factor is whether it is likely that consumers will assume either that the junior user’s product is associated with or a product of the senior. (Centaur Communications v A/S/M Communications, 830 F2d 1217, 1226 [2d Cir 1987], supra.) Thus, the court may consider whether the products, or trade names differ in content, geographic distribution, market posi *121 tion or audience appeal. (C.L.A.S.S. Promotions v D.S. Mags., supra, at 18.)
The products herein, hotel service are identical, though with differing size and place.
4. Bridging the Gap
This factor looks to “whether the senior user of the mark is likely to enter the market in which the junior user is operating”. (Centaur Communications v A/S/M Communications, 830 F2d, at 1227, supra.) Trademark law protects the senior user’s right to enter a related field in the future. (Scarves by Vera v Todo Imports, 544 F2d 1167, 1172 [2d Cir 1976].)
The senior user, plaintiffs, entered the hotel service market in 1963, almost 20 years before the junior user entered the market in 1982 though with a different style and scale.
5. Actual Confusion
The fifth Polaroid factor looks to whether any consumers have actually been confused by the two products. The Lanham Act seeks to prevent consumer confusion that enables a seller to pass off its goods or trademark as that of another. (W.W.W. Pharm. Co. v Gillette Co., 984 F2d, supra, at 574.) Where reverse confusion is alleged, it “is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user.” (Lang v Retirement Living Publ. Co., 949 F2d, supra, at 583.)
The issue of likelihood of confusion turns on whether “numerous or dinar [il]y prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant’s mark.” (Gruner + Jahr USA Publ. v Meredith Corp., supra, at 1077; see, e.g., Plus Prods. v Plus Discount Foods, 722 F2d 999, 1005, 1008 [2d Cir 1983].) Likelihood of confusion means a probability of confusion; “it is not sufficient if confusion is merely ‘possible’.” (3 McCarthy, Trademarks and Unfair Competition § 23.01 [3] [a], at 23-10 — 23-11 [3d ed 1996].)
Plaintiffs claim 4,000 misdirected telephone calls a year, or 10 to 15 calls daily plus misdirected mail. The fact that Mados Wyndham Hotel is in Manhattan and that the Texas Wyndham Hotel spent $35,000,000 in advertising, maintains an active sales office (generating between 1984 and 1992 $300,000,000 in revenue) in Manhattan does support likelihood of confusion.
*122 6. Junior User’s Bad Faith
This test factor considers “ ‘whether defendant adopted its mark with the intention of capitalizing on plaintiffs reputation and goodwill and any confusion between his (defendant) and the senior user’s (plaintiffs) product’ (Lang v Retirement Living Publ. Co., supra, at 583.)
It is alleged by the plaintiffs that Texas Wyndham Hotel not only violated its “gentleman’s agreement” but after the stay of Trammell Crow at the Mados Wyndham Hotel on March 11, 1983 was aware of the plaintiffs’ mark prior to using the Wyndham name. This, defendants deny, pointing to a prior memo (from Carine Kline to Trammell Crow) dated October 28, 1981 discussing room rate at a soon-to-open Wyndham Hotel. In this circuit, proof of actual knowledge can give rise to an inference of bad faith. (Centaur Communications v A/S/M Communications, 830 F2d 1217, 1228 [2d Cir 1987], supra.) Accordingly, the plaintiffs may demonstrate that Texas Wyndham Hotel acted in bad faith, a factor that will weigh towards issuance of an injunction. (W.W.W. Pharm. Co. v Gillette Co., 984 F2d 567, 575, supra; see also, Scarves by Vera v Todo Imports, 544 F2d, supra, at 1172.)
Plaintiffs have not fully sustained their burden of proof herein.
7. Quality of Junior User’s Product
As evidence of the quality of the product, Mados Wyndham Hotel has submitted reference to its hotel in studies, travel guides, books, magazines and TV interviews.
8. Sophistication of the Consumers
As a general rule, sophistication of the consumer is a factor that will weigh against a finding of likelihood of confusion of the relevant purchasers. (Arrow Fastener Co. v Stanley Works, 59 F3d 384, 399, supra, citing W.W.W. Pharm. Co. v Gillette Co., supra, at 575; see also, Cadbury Beverages v Cott Corp., 73 F3d 474, 480 [2d Cir 1996].) The defendant suggests that the hotel consumer group is small, sophisticated and somewhat elite and not likely to be confused. (See, 3 Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 [4th ed 1983].)
9. Discussion of Lanham Act § 32 and Common-Law Infringement Claims
Plaintiffs claim trademark infringement under both the Lanham Act and the State common law. Infringement of a *123 registered trademark is prohibited by section 32 (1) of the Lanham Act. (15 USC § 1114 [1].) Section 32 (1) prohibits the use of a registered trademark without permission, in connection with the sale or advertising of goods or services, in a manner that is likely to cause confusion or mistake or to deceive the purchaser as to the source or sponsorship of the goods. (15 USC § 1114 [1]; see, Gruner + Jahr USA Publ. v Meredith Corp., 991 F2d 1072, 1075, supra.)
The standard for granting preliminary injunctive relief in this State and Federal circuit is well settled. Mados Wyndham Hotel must show “(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.” (Jackson Dairy v H.P. Hood & Sons, 596 F2d 70, 72 [2d Cir 1979] [Per Curiam]; see, Hasbro Bradley v Sparkle Toys, 780 F2d 189, 192 [2d Cir 1985].)
G. OTHER ISSUES RAISED
1. Registration
a. Federal
Defendants duly registered (No. 1,962,596) the service mark “wyndham garden” on March 19, 1996, with the United States Patent and Trademark Office (USPTO). Defendants had previously filed a Federal trademark application with the USPTO (registration No. 1,424,204) on February 14, 1992 which sought concurrent hotel service use of the name and mark “wyndham” throughout the United States, except for New York. Thereafter, on June 20, 1995, defendants amended their Federal trademark application to include New York except for the “trading area bounded by 63rd Street on the North, Fifth Avenue on the East, the Hudson River on the West and 57th Street on the South.” (Plaintiffs’ exhibits 33, 34.) (Subsequently, Yassky Wyndham Partnership filed its notice of opposition to any New York extension [opposition No. 97,831].) Such opposition was later withdrawn by agreement between defendants and the Yassky Wyndham Partnership, dated November 1, 1995.
Defendants claim that, pursuant to 15 USC § 1057 (b), a mark’s certificate of registration is prima facie evidence of: (1) its validity and registration; (2) registrant’s ownership thereof; *124 and (3) registrant’s exclusive right to use the registered mark in connection with services specified in the certificate.
Putting aside plaintiffs’ claims of misrepresentation before the USPTO, the later issued a decision in March 1994 that, inter alia, stated:
“it is in the interest of judicial economy to stay this Administrative Board proceeding pending a final decision in the state court action * * *
“In view of the circumstances of this case, it is believed that the proper course of action is to suspend all proceedings pending the final determination of the civil case.” (Plaintiffs’ exhibit 95.)
Thus, USPTO has deferred to this court’s final decision.
b. State
On April 1, 1996, plaintiffs filed applications to register the service marks: (1) “wyndham”; (2) “the wyndham hotel”; and (3) “the wyndham” with the Wyndham crest which were duly registered on April 12, 1996, under General Business Law § 209-a, which certificate shall be prima facie evidence of the right to exclusive use in the State of New York of such name(s) by the registrant. Such is subject to cancellation by the court in its reasonable discretion if primarily a surname or geographic place, for improper registration, unless it has become distinctive of the applicant’s services. (See, General Business Law §§ 209-a, 209-c, 361, 367.) (N.B., the court notes that this action was commenced on or about June 30, 1992, and its trial began on or about May 1,1996, which dates have some proximity to the US and NY registration dates.)
2. Secondary Meaning
This issue, as noted above (at 117, supra), is obviated by its equivalent issue, likelihood of confusion. (2 McCarthy, op. cit, § 15.03 et seq.) In any event, plaintiffs are strong on traditional (Centaur Communications v A/S/M Communications, 830 F2d 1217, supra) factors No. 3 (sales success — 85% occupancy rate) and No. 4 (unsolicited, also known as free, coverage — i.e., celebrity guests and newspaper column and book citations), moderate on factors No. 5 (attempts to plagiarize name— Trammell Crow 1983 stay in plaintiffs’ hotel and later name use) and No. 6 (length and exclusivity of use of name — since the 1920’s by the Hotel — 1963 to 1983 — 20 years by plaintiffs) though weak on factors No. 1 (advertising expenditures) and No. 2 (consumer surveys).
*125 In any event, the mark (i.e., “Wyndham” name with an English origin), if not arbitrary, is inherently distinctive as suggestive (i.e., English and European decor, architecture and celebrity guests), not requiring secondary meaning. (See, Abercrombie & Fitch Co. v Hunting World, 537 F2d 4, 9, supra; see, 119-120, supra.)
3. Wyndham a Surname and Geographical Place
Relatively speaking, ‘Wyndham” as a surname in the metropolitan area (target of injunctive relief) is sparse (less than a total of 10 telephone directory listings) and, thus, not “primarily * * * & surname” (General Business Law § 361 [e] [3] [emphasis added]).
As a geographical place, all other names within the sought injunctive radius area (50 miles) are spelled “Windham” not “Wyndham”. While genealogically significant in England and New England, it did not bar New York State registration under General Business Law §§ 209-a and 209-c. If not prima facie evidence of exclusivity, this was in addition to plaintiffs’ rights under the lease to which defendants are subject since November 1, 1995.
4. Laches and Estoppel
Defendants claim that between their July 31, 1984 letter and the commencement of this action on or about June 30, 1992, plaintiffs did nil to enforce their claimed rights to injunctive relief. This knowledge of defendants’ name use was inexcusable delay (eight years) and prejudices defendants by inequitable assertion of rights to support an affirmative defense of laches with the above elements of equitable estoppel. (Sara-toga Vichy Spring Co. v Lehman, 625 F2d 1037, 1040 [2d Cir 1980], citing Cuban Cigar Brands v Upmann Intl., 457 F Supp 1090, 1096 [SD NY 1978] [Weinfeld, J.].) Saratoga Vichy is factually distinguishable in that it failed to bring suit for 61 (1910-1971) years, but that its claim of abandonment was dismissed for lack of requisite intent.
Plaintiffs persuasively argue that they relied on the 1984 “gentleman’s agreement” until 1992 which was de facto, performed year to year, upon which plaintiffs relied rebutting inexcusable (as distinct from “mere”) delay.
Thus, it appears to this court that a balancing of the equities, including possible egregious conduct as defendants expanded, negates a laches defense.
*126 5. Gentleman’s Agreement
Plaintiffs claim, while defendants deny citing General Obligations Law § 5-701 (Statute of Frauds), there was a “gentleman’s agreement” following plaintiffs’ July 31, 1984 “cease and desist” letter after defendants’ opening of a sales office at 10 Columbus Circle, New York, New York. Such oral “gentleman’s agreement” provided defendants would refrain from opening a “Wyndham” hotel in New York City and redirect any misdirected inquiries or telephone calls by disclaiming any plaintiffs’ affiliation and provide its correct telephone number. In support, plaintiffs note defendants did redirect approximately 4,000 to 4,500 inquiries per year and defendants’ public relations firm referred to same in communications with Jerry Hulse, former Los Angeles Times travel editor.
This court believes, like the wise, diplomatic cleric, that both parties are correct, plaintiffs — factually and defendants— legally. So there was a de facto oral agreement renewable, year to year.
6. Attorneys’ Fees
Lanham Act or 22 NYCRR 130-1.1 (Rules of Chief Administrator of Courts) held in abeyance.
H. FINDINGS
1. Injunctive Relief
Applying the above-noted (123, supra) classic case law principles to this case, the court finds, under the facts and circumstances herein, by a fair preponderance of the credible evidence:
(a) Plaintiffs, Mados Wyndham Hotel, would sustain irreparable harm by threatened family hotel business extinction or diminution (to the East 57th to 63rd Streets, Fifth Avenue to Hudson River Manhattan) by defendants, Texas Wyndham Hotel, owner or operator of 72, by last count, hotels, motels and resorts — after 35 profitable years. All of this under a lease expiring May 31, 2020, whose proprietary rights were transferred from the Yasskys to the Texas Wyndham Hotel on November 1, 1995.
(b) Plaintiffs’ likelihood of success on the merits was best and definitively articulated by the Appellate Division, First Department, on March 1, 1994 (202 AD2d 159) when its Per Curiam stated in this very case: “We agree with the IAS Court *127 [157 Misc 2d 307 (Ciparick, J.)] that the lease, read as a whole, supports plaintiff hotel lessee’s contention that it was to have exclusive use of the hotel name ‘Wyndham’ during the life of the lease (see, Shubert v Columbia Pictures Corp., 189 Misc 734, affd 274 App Div 751)”.
(c) Since defendants, Texas Wyndham Hotel, have now merged, by their November 1, 1995 acquisition, their interest with the Yasskys, this moots the second cause of action. Furthermore, as noted above by the Appellate Division, First Department, plaintiff, Mados Wyndham Hotel, has exclusive use of the hotel name ‘Wyndham” during the life of the lease until May 31, 2020, whose other bound signatory was the Yasskys originally and now, since November 1, 1995, defendants, Texas Wyndham Hotel. Thus, plaintiffs have a reasonable likelihood of success on the merits.
(d) The balance of hardships (accelerated diminution or extinction for plaintiffs as against stunted progressive hotel chain expansion for defendants) though temporarily uncertain if Texas Wyndham Hotel have sold their interest to a REIT named Patriot American Hospitality, Inc. (see, XIII Crain’s New York Business, No. 15, at 15, cols 3-5 [Dec. 15-21, 1997]).
2. The Appropriate Zone of Injunctive Protection
What is an appropriate boundary must begin by recognition that trademark protection is deeply rooted in the common law, with emphasis on the focus on the property rights of a proprietor who, by hard work over a long period and sensitivity to his customers’ needs, has built up goodwill in the name of his business. The courts have recognized that the property right from the use of a particular name or symbol in connection with a business, a product or a service is essentially a common-law property right. (See, Keebler Co. v Rovira Biscuit Corp., 624 F2d 366, 372 [1st Cir 1980]; International Order of Job’s Daughters v Lindeburg & Co., 633 F2d 912, 919 [9th Cir 1980], cert denied 452 US 941 [1981] [trademark is a form of business property].)
In Siegel Co. v Trade Commn. (327 US 608, 612 [1946]), Justice Douglas referred to trade names as “valuable business assets” and to “the policy of the law to protect them as assets of a business”. Almost 150 years ago, in Howard v Henriques (3 Sandf 725, 727 [1850]), the New York City Superior Court proclaimed: “[I]f one man has, by close attention to the comfort of his guests, and by superior energy, made his hotel desirable *128 for the traveller, and caused its name to become popular throughout the land, another man ought not to be permitted to assume the same name in the same town, and thus deprive him who first appropriated the name, of some portion of the fruits of that good will which honestly belong to him alone.”
The Howard case (supra) has been cited by State as well as Federal courts in cases involving hotels and the principle established therein remains a vital component of modern trademark law. (See, Neva-West Corp. v Never Wet Processing Corp., 277 NY 163 [1938]; White Studio v Dreyfoos, 221 NY 46 [1917]; American Safety Table Co. v Schreiber, 269 F2d 255 [2d Cir 1959].)
While plaintiffs, Mados Wyndham Hotel, are entitled to exclusive use of their name, there are certain relative constraints. First, the court notes that, thus far, plaintiffs’ proof of any damages has been purely speculative. There appears no fair, concrete formula or amount(s) to assess damages except to a reference to the sale of the remaining leasehold with negotiations herein unsuccessful. Second, there is declining time (22 5/12 years) since the lease ends May 31, 2020 and then, as of now, reverts to defendants. Third, defendants have already built hotels within the 50-mile radius (i.e., Piscataway and Hauppauge, Wyndhams) while plaintiffs did not act (laches). There is a time conflict here — 19th century style in the late 20th century, both facing the 21st century imminently.
In the interests of reasonable justice and fairness this court finds that the reasonably appropriate injunctive protection after considering gradually shrinking time and area zones, but determined such create more factual and practical issues than resolved, should be the Borough of Manhattan or New York County only. Thus all other areas without the Borough of Manhattan or New York County may use the name (but not the crest) “wyndham”, subject to all four conditions set forth in this court’s order, dated August 12, 1996.
I. CONCLUSION
Accordingly, for the above-stated reasons, plaintiffs’ first and second causes of action declaring plaintiffs have the use and mark “Wyndham” in connection with the operation of their Mados Wyndham Hotel for the unexpired term of its lease until May 31, 2020, including injunctive relief is granted against defendants, Texas Wyndham Hotel and Yassky Wyndham Partnership, to the extent set forth hereinabove; *129 otherwise denied. Claim for attorneys’ fees held in abeyance until further order of the court.
[Portions of opinion omitted for purposes of publication.]