[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 11663
I. Procedural History
The plaintiff, The Mohegan Tribe of Indians of Connecticut, brought this action in order to restrain The Mohegan Tribe and Nation, Inc., the Fortin Group, individual defendants and the Standing Bear Group individual defendants from using the words "Mohegan," "The Mohegan Tribe," "The Mohegan Tribe and Nation," "The Mohegan Tribe and Nation, Inc.," and/or the "Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc." (Amended Complaint, Prayer for Relief, para. (a)). On August 8, 1998, this court granted both the Fortin Group and Standing Bear Group defendants' Motion to Dismiss the plaintiff's claims against each individual defendant for failure to establish a prima facie case. The only remaining defendants in this action are the corporation, The Mohegan Tribe and Nation, Inc. and the Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc.
II. Claims of the Plaintiff
The defendants' infringement on the plaintiff's trade name has resulted in confusion of the public between the plaintiff and defendants and is likely to continue to cause confusion if left unabated. The defendants' actions have resulted in the plaintiff's loss of control of the use of its name, its history and its culture and the loss of the good will associated with the names "Mohegan" and "Mohegan Tribe." The Mohegan Tribe is entitled to an injunction against the defendants, prohibiting them from the continued use of the name "Mohegan" and "Mohegan Tribe" in any fashion that is likely to cause confusion. The defendants' intentional misuse of the plaintiff's trade names further entitles the plaintiff to the recover of costs, attorney's fees and punitive damages.
III. Facts
The word "Mohegan" means "wolf" in the Algonquin family of languages. It has been incorporated into the English language under several spellings.[1] The first Native American group referred to as "Mohegan" occupied land on the banks of the Hudson River in New York prior to the arrival of European settlers. At the turn of the 17th century, a group of Mohegans left the tribal lands in New York and migrated to Connecticut. In the early part CT Page 11664 of the 17th century, Chief Uncas became a folk legend with his group of Mohegans or wolf people.
Over the ensuing years, the Mohegans experienced a dwindling of their land base and underwent changes in the form of tribal leadership.[2] During the middle part of the 20th century, leadership within the tribe became more dispersed until John Hamilton assumed a strong leadership rule in 1966. Under Hamilton's leadership, the tribe resumed its pursuit of land claims. In 1970, a schism developed in the tribal leadership and Hamilton, a/k/a Chief Rolling Cloud, left the tribal leadership to lead his own group of Mohegans, referred to in this action as the Fortin Group. 59 Fed. Reg. 12140, 12141.
Throughout the 1980s, the Fortin Group engaged in cultural activities and was involved in the community as the Mohegan Tribe and Nation. During that time, the Fortin Group was also actively engaged in seeking both state and federal recognition, and its research also assisted the plaintiff in its pursuit of recognition. John Hamilton died in 1988, designating Eleanor Fortin as his successor. Eleanor Fortin continued John Hamilton's activities and led the Fortin Group to incorporate the Mohegan Tribe and Nation, Inc. in 1992. The evidence submitted at trial conclusively shows that the incorporators of The Mohegan Tribe and Nation, Inc. are Mohegans by ancestry. (Testimony of enrollment director, conceding ancestry of the Baker family; testimony of Eleanor Fortin and others concerning the Fowler family.)
It is conceded by defendants that the plaintiff is a state and federally recognized Indian tribe. The defendant, the Mohegan Tribe and Nation, Inc., is a corporation originally established by the Fortin Group and then, in 1996, turned over to the Standing Bear Group. The Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc. is the successor to the Mohegan Tribe and Nation, Inc. and was established by the Standing Bear Group.
The Mohegan Tribe and Nation, Inc. was incorporated in 1992. (Defendant Fortin Exhibits 2 and 3.) The plaintiff did not achieve a federal recognition until March of 1994. (See para. 13, Plaintiff's Amended Complaint of August 4, 1998.) In fact, as was conceded at trial, the actual federal recognition documents mention the Mohegan Tribe and Nation, recognizing its existence, but specifically stating that the federal recognition does not CT Page 11665 apply to that entity. The Mohegan Tribe and Nation, Inc. was in existence prior to the plaintiff becoming federally recognized, but the federal government recognized the Mohegan Tribe and Nation, Inc. and specifically referred to that entity in its grant approval of recognition.
The plaintiff submitted some 88 exhibits, attempting to establish confusion or the likelihood of confusion. William Sears, plaintiff's first witness. testified that there were very few phone calls during the six-month period he worked for the Standing Bear Group, and during that time, any phone callers looking for the plaintiff were properly referred to the plaintiff. His testimony was that the Standing Bear Group received hundreds of phone calls during that six-month period when he worked at the tribal offices, but only a handful were people looking for the Casino Mohegans, and those were referred to the proper telephone number. Standing Bear testified that the policy regarding Montville phone calls was to refer all calls to the proper telephone number. At no time did he issue orders that telephone calls were to be referred to him. Christy Johnson, Standing Bear's daughter, also testified that she never was under orders to refer telephone calls to Standing Bear. All telephone calls were referred to the proper parties. Standing Bear denied ever instructing Clayton Price to lie about the status of the tribe; he denied ever instructing Clayton Price to lie to Gtech, to Klewin and to Jerry Johnson. He admits to giving Clayton Price too much authority.
The plaintiff's expert witness, Mrs. D'Angelis, offered puzzling and inconclusive testimony. She was asked to compare Plaintiff's Exhibits 1 and 2, adoption certificates for Standing Bear and Kenneth Watrous, executed by John Hamilton. Her "expert" opinion was that "one or both are not genuine." Under cross examination, she again affirmed the fact that she could not render an opinion that both documents were not genuine. Her testimony proved inconclusive. In another portion of her testimony, she testified that she did visit Standing Bear's office and was able to examine to "original" of Plaintiff's Exhibit 1. She did not remember whether it contained a raised seal or blue ink, but did recall that it was on "onion skin" paper. She testified that she had no opinion as to whether the original document at Standing Bear's office was authentic. This testimony is questionable because of her inability to remember characteristics of the original of Plaintiff's Exhibit 1, which was exhibited at trial. The court made the comment that it was CT Page 11666 not an onion skin document in the traditional sense of that term.
Ward Alling was called to testify on behalf of the plaintiff. The purpose of his testimony was to question the authenticity of Standing Bear's adoption certificate, since it was Mr. Alling who notarized John Hamilton's signature. However, Mr. Alling's memory failed him on several occasions. At trial, he testified that he was a notary public for 25 years, but at his deposition it was 12 years. Mr. Alling's testimony regarding the document was not credible. The testimony of William Storey, another witness for the plaintiff, who testified under direct examination and cross examination that he saw no confusion exhibited by the general public while he worked at the tribal offices. Standing Bear himself testified, and the plaintiff's exhibits support this testimony, that whenever a document was published, whether a letter, a flyer, a pow-wow program or any other manuscript, Standing Bear's group always referred to itself as Mohegan Tribe and Nation, never just Mohegan Tribe. (See Plaintiff's Exhibits 45, 46, 47, 48, 28, 29, 31, 60, 61 and 66.)
The court must conclude from the above that the defendant's use of the name "Mohegan" has never caused actual confusion in members of the general public.
IV Law
The plaintiff claims the Mohegan Tribe's trade names are entitled to protection under the Connecticut common law and under the federal Lanham Act.
1. The Lanham Act
The Lanham Trade-Mark Act, generally 15 U.S.C. § 1111, et seq. provides in part as follows:
 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods services, or commercial activities CT Page 11667 by another person, or
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
The owner of a trademark or trade name shall "be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce, of a mark or a trade name, if suchuse begins after the mark becomes famous and causes dilution ofthe distinctive quality of the mark . . ." 15 U.S.A. Section 1125(c)(1) (emphasis added).
Although concerning itself with trademarks, the Lanham Act's protections, just as under common law, extend to trade names as well. Railroad Salvage of Connecticut, 561 F. Supp. at 1019;15 U.S.C. § 1125(a), 1127. Generally speaking, a plaintiff must prove three elements in order to prevail under the Lanham Act: (a) the ownership of a distinctive name; (b) prior use of the name in interstate commerce; and (c) its use by another in a manner likely to cause confusion as to the origin of the goods and service in question. Id.
Initially, a plaintiff claiming trade name infringement must prove its claimed trade name is entitled to protection, that it is a valid trade name, and that its use was prior to that of the defendants.
The plaintiff must first prove that its claimed trade name constitutes a valid trade name. Arrow Fastener Co., Inc. v.Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995); Covenant RadioCorp. v. Ten Eighty Corp., 35 Conn. Sup. 1, 6-7 (1977). "Whether the [name] is entitled to protection depends on whether it is inherently distinctive or, if merely descriptive, has acquired `secondary meaning.'" Arrow Fastener Co., 59 F.3d at 390 (citations omitted). When a name has, in fact, become known in the public as the name for a particular business or entity, it will be afforded trade name status and protection. Shop-Rite Durable Supermarket,173 Conn. at 266, quoting Restatement, Torts § 716, comment a.
The Mohegan Tribe's trade names, "Mohegan" and "Mohegan CT Page 11668 Tribe," are highly distinctive names as demonstrated by their strength or ability of the name itself to identify the plaintiff as that aboriginal Native American tribe of Indians located in Southeastern Connecticut. Arrow Fasteners Co., Inc. v. StanleyWorks, supra; B.V.D. Licensing Corp. v. Body Action Design. Inc.,846 F.2d 727 (Fed. Cir. 1988). The strength of the Mohegan Tribe name is evident from its recognition by the United States government as identifying the plaintiffs the successor to the aboriginal entity known as the Mohegan Tribe.25 U.S.C. § 1775(a)(2). The State of Connecticut has also so recognized the plaintiff. Connecticut General Statutes § 47-59a(b).
The plaintiff is the Mohegan Tribe commonly known throughout the State of Connecticut and the United States of America, if not the world, as that distinct and unique Native American Indian tribe from Southeastern Connecticut. When a name has become so famous as to be a household word synonymous with the trade name owner, the court is entitled to take judicial notice of it. "Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions. Brown v. Piper, 91 U.S. (1 Otto) 37, 42, 23 L.Ed. 200 (1875)." B.V.D. Licensing Corp. v. Body ActionDesign. Inc., 846 F.2d at 728; see also, Tait LaPlante, Handbook of Connecticut Evidence, § 6.2 (2d Ed., 1988). Webster's Ninth Collegiate Dictionary (Merriam Webster, Inc., 1991) defines "Mohegan" as "a member of an American Indian people of Southeastern Connecticut." "When a trademark attains dictionary recognition as a part of the language, [the court will] take it to be reasonably famous." Id. In considering the fame or notoriety of a trade name, "dictionaries and encyclopedias may be consulted." Id. (Citations omitted); see Tait LaPlante, supra, § 6.2.2.(h) judicial notice); Berganv. Central Vermont Ry., 82 Conn. 574, 576 (1909); Hygia DistilledWater Co. v. Hygia Ice Co., 70 Conn. 516, 534 (1898) (reference to dictionary in considering validity of trade name).
In addition, members of the general public confirm the distinctiveness of the Mohegan Tribe's trade name to identify the plaintiff as the Mohegan Tribe. Mr. Don Mallon, an auto dealer in Montville for more than 20 years, testified that he always understood that the plaintiff was the one and only Mohegan Tribe. The fame of the plaintiff's name was sufficient to convince Mr. Mallon that he was dealing with the Mohegan Tribe when he mistakenly purchased advertising in the defendant's "pow wow brochure," even though the advertising contract had a Norwich, CT Page 11669 as opposed to an Uncasville, address. See Plaintiff's Exhibit §§ 33 and 34.
Thus, the plaintiff claims it has demonstrated that the names "Mohegan" and "Mohegan Tribe" are distinctive and should be found valid trade names worthy of protection.
Standing Bear responds to this argument that the plaintiff is not entitled to relief under the Lanham Act because it has not established priority in time of its mark nor has it established any damages.
As was pointed out above, the Mohegan Tribe and Nation, Inc. was incorporated prior to the plaintiff becoming federally recognized. The federal recognition process itself recognized the Mohegan Tribe and Nation, Inc. as a separate and distinct entity. In order to prevail on a claim of trademark infringement in violation of the Lanham Act, a plaintiff must show (1) that it has a valid mark that is entitled to protection under the Act; and (2) that use of the defendant's mark infringes or is likely to infringe on the mark of the plaintiff. Sports Authority, Inc.v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996);Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995); Gruner Plus Jahr USA Publishing v. Meredith Corp.,1991 F.2d 1072, 1075 (2d Cir. 1993).
"The test for infringement is whether the actor's use of a designation as a trademark . . . creates a likelihood of confusion . . ." Estee Lauder. Inc. v. The Gap Inc.,108 F.2d 1503, 1508-1509 (2d Cir. 1997). The plaintiff, in its preliminary trial memorandum dated August 3, 1998, characterizes the name of the Mohegan Tribe as a suggestive trade name. (See page 15.) A suggestive mark is one that "suggests the product, though it may take imagination to grasp the nature of the product."Bristol-Myers Squibb Co. v. McNeil-PPC. Inc., 973 F.2d 1040. (A suggestive mark "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." [internal quotation marks omitted]; Abercrombie and Fitch Co. v. HuntingWorld. Inc., 537 F.2d 11.
The issue of likelihood of confusion depends on whether "numerous ordinarily prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." GrunerPlus Jahr Publishing v. Meredith Corp., 991 F.2d 1077; see ArrowCT Page 11670Fastener Co. v. Stanley Works, 59 F.3d 390-91; Plus Products v.Plus Discount Foods. Inc., 722 F.2d 1003. Likelihood of confusion means a probability of confusion; "It is not sufficient if confusion is merely possible." Estee Lauder. Inc. v. The Gap.Inc., 108 F.2d 1503, 1508-1509 (2d Cir. 1997).
While the term "Mohegan Tribe" is distinctive, its existence does not predate the formation of the Mohegan Tribe and Nation, Inc., which was incorporated and in use prior to the federal recognition of the plaintiff. While the name "Mohegan Tribe of Indians of Connecticut" is similar to the Mohegan Tribe and Nation, Inc., the two are different and the Standing Bear Tribe has made a point in all of its publications to use the entire name of the corporation, thereby using their best efforts to avoid confusion. The Mohegan Tribe and Nation, Inc. subsists on dues and crafts. It is ludicrous to suggest that the plaintiff's main activity is the production of arts and crafts. The plaintiffs main activity is the operation of the Mohegan Sun Casino, an activity which neither group of defendants even comes close to matching. To suggest that the defendants did not adopt the name "Mohegan Tribe and Nation" in good faith begs the question, since the name was adopted prior to the Mohegan Tribe of Indians of Connecticut achieved its federal recognition. Finally, there is no strong likelihood of confusion, because the ordinary person is aware that the main activity of the plaintiff is the operation of a casino. The general public is, in all likelihood, not even aware of the existence of either of the corporations cited as defendants in this case. See Estee Lauder,Inc. v. The Gap. Inc., 108 F.2d 1503 1508-1509 (2d Cir. 1997).
The defendant, Fortin Group, claims that the plaintiff has failed to prove a violation of the Lanham Act.
The plaintiff's use of the term "Mohegan" is not protected by the Lanham Act, 15 U.S.C. § 1051 et seq., because "Mohegan" is a generic term. A trademark is "any word, name, symbol or device or any combination there of used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. In Abercrombie Fitch Co. v. Hunting World. Inc.,537 F.2d 4 (2d Cir. 1976), the court held that trademarks can be placed in one of several categories for determining the degree to which they are protected by the Lanham Act. The categories are, in order of ascending degree of protection: (1) generic; (2) CT Page 11671 descriptive; (3) suggestive; and (4) arbitrary or fanciful.Abercrombie Fitch, 537 F.2d at 9. See also Two Pesos. Inc. v.Taco Cabana. Inc., 505 U.S. 763, 768, 112 S.Ct. 2753, 2757,120 L.Ed.2d 615 (1992); and Genesee Brewing Co Inc. v. Stroh BrewingCo., 124 F.3d 137, 142-143 (2d Cir. 1997).
"A generic mark is generally a common description of goods, one that refers, or has come to be understood as referring, to the genus of which the particular product is a series" (internal citations omitted) Genesee, 127 F.3d at 143. "Generic marks are never entitled to trademark protection. (Emphasis added.)Genesee, 124 F.3d at 143. "No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." (Internal citations omitted.) Abercrombie Fitch, 537 F.2d at 9. "Where the nature of a new product can be expressed in only one way, a manufacturer may not trademark the words necessary to describe the product." Genesee, 124 F.3d at 145 (footnote 5) (and cases cited therein).
The word "Mohegan" is a generic term not subject to protection by the Lanham Act. In the Algonquin language, it means "wolf." "Mohegan" has also been used to describe various groups of Native Americans that trace their lineage to a tribe originally inhabiting lands in New York. It has been spelled "Mohegan" with reference to persons of Mohegan ancestry living in Connecticut, including both the plaintiff and both groups of defendants. It has been spelled "Mohican" when referring to the federally-recognized Stockbridge-Munsee Community of Mohican Indians of Wisconsin (who left Connecticut when forced to choose between adopting Christianity or being deported). The word has also been spelled "Mahican," prior to the turn of the century, in reference to the Mohegan tribe in New York.
Also, the word "Mohegan" in its various spellings has long been used in commerce in Connecticut in the names of several businesses including florists, painters, an apartment building and a community college."[3] (SNET Telephone Directory for Norwich submitted for judicial notice by the plaintiff) (The defendant is unaware of any action taken by the plaintiff to restrain these entities from using the word "Mohegan."
All the evidence in this case shows that the word "Mohegan" CT Page 11672 refers to people of a particular ancestry. The word "Mohegan" was first popularized in literary America by James Fennimore Cooper in his book, "The Last of the Mohicans," later the subject of a popular movie of the same name. The fact that the plaintiff has popularized the name "Mohegan Sun" through the immense success of its casino operation cannot change the fact that "Mohegan" refers to a people's ancestry. Thus, "Mohegan" is a generic term under the Abercrombie criteria.
Not only is "Mohegan" a generic term, it is the only term that the defendant corporation can use to properly describe its purpose and function. First, the corporation was formed so that the members of the Fortin Group could promote understanding in the community of their Mohegan heritage. Second, the corporation was incorporated to provide an organization that could draw the members of the Fortin Group Mohegan community. together. Third, the corporation was created to serve as the vehicle for promoting traditional Mohegan cultural events, such as the annual pow-wow. Fourth, the Fortin Group defendants believed that it was necessary to establish the corporation to obtain federal grants for genealogy and anthropology research necessary in its efforts for state and federal recognition as a tribe of Mohegans.
Given the purposes of the formation of the defendant corporation, there were no other words that the defendant could use to describe the corporation. The defendant's need to use the word "Mohegan" in its title is no different than any other cultural group's use of its ethnic heritage. It would be unthinkable that groups of Irish-Americans or Italian-Americans could not use the word "Irish" or "Italian" to name their cultural centers or clubs. Thus, as the Genesee court stated, the plaintiff's use of "Mohegan" is not and cannot be protected under the Lanham Act because there is no other way to describe the defendant's commercial and non-commercial function.
At the present time, the Fortin Group defendants do not seek to continue the use of the name "Mohegan Tribe and Nation," however, the use of the term "Mohegan" in its name is essential to its purposes.
V. Common Law
In Connecticut, under our common law, a trade name will be protected: CT Page 11673
 If the court finds that the effect of appropriation by one corporation of a distinctive portion of the name of another is to cause confusion and uncertainty in the latter's business, injure them pecuniary and otherwise, and deceive and mislead the public, relief will be afforded . . . It is not sufficient that some person may possibly be misled, but the similarity must be such that any person, with such reasonable care and observation as the public generally are capable of using and may be expected to exercise, may be likely to mistake one for the other. Middletown Trust Co. v. Middletown National Bank, 110 Conn. 13, 21 (1929).
In Middletown, the court found that "the consequences of the appropriation of a name so similar to that of the plaintiff and its employment in the defendant's business, in competition with the plaintiff . . ." provided the defendant the opportunity for relief 110 Conn. 13, 21. This same doctrine was applied repeatedly to avoid misleading the public when both the plaintiff and defendant operated same or similar businesses. Shop-RiteDurable Supermarket. Inc. v. Motts Shop Rite, 173 Conn. 261, 266
(1977). Yale Co-Operative Corp. v. Rogin, 133 Conn. 563, 571
(1974).
The case of Connecticut Family Chiropractic. P.C. v.Connecticut Family Orthopedics. P.C., 1993 WL 128528 Conn. Sup., underscores the reluctance of Connecticut courts to grant injunctions in the context of trade name infringement suits. InConnecticut Family, the court observes as follows: "No court of equity should ever grant an injunction merely because of the fears or apprehensions of the party applying for it. Those fears or apprehensions may exist without any substantial reason. Indeed, they may be absolutely groundless. Restraining the action of an individual or corporation by injunction is an extraordinary power, always to be exercised with caution, never without the most satisfactory reasons." 1993 WR 128528, 2.
It is clear that in Connecticut a trade name will be protected if it is likely to cause confusion and creates an atmosphere of unfair competition, so misleading to the general public so as to cause pecuniary damage to the plaintiff. In the instant case, the plaintiff and defendants are not in competition. It has not been established that the plaintiff's business, that of running and operating the Mohegan Sun Casino, has been affected. The activities of the defendants Mohegan Tribe CT Page 11674 and Nation, Inc. and Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc. are so modest in scope and so divorced from the activities being conducted by the plaintiff that no prudent individual could ever mistake the two entities as being one and the same. Add to the fact that the Mohegan Tribe and Nation, Inc. was incorporated in 1992, approximately two years before the plaintiff received its federal recognition and one is left with the unavoidable conclusion that the term "Mohegan" is not solely the property of the plaintiff.
The plaintiff claims that the defendants' argument that since the defendant Mohegan Tribe and Nation, Inc. was incorporated in 1992, its use of the name Mohegan Tribe and Nation was prior in interest to that of the plaintiff. This ignores documented and historical evidence of 300 years of prior use by the plaintiff. As the successor in interest to the 300 year old aboriginal entity known as the Mohegan Tribe, the plaintiff is entitled to rely upon the use of that term by the original holder of the trade name, and is entitled to the good will generated thereby.Home of the Week, Inc. v. Associated Press. Inc., 178 F. Sup. 460,464-465 (D.R.I. 1959).
In any event, the Mohegan Tribe was also recognized by the State of Connecticut prior to 1992, and prior to the defendants' use of the name Mohegan Tribe and Nation. See Connecticut General Statutes § 47-59a(b) (P.A. 89-368), § 16) (recognizing Mohegan Tribe as self-governing entity); Connecticut General Statutes § 47-59b (P.A. 73-660) (naming Mohegan Tribe as a tribe entitled to appoint representative to Indian Affairs Council); Special Law Concerning certain trust funds for the Mohegan Indians, Special Laws of the State of Connecticut, June 2, 1871, acknowledging transfer of certain funds to be "held in trust for the benefit of the Mohegan Tribe of Indians"). It is thus without question that the Mohegan Tribe has used the names "Mohegan" and "Mohegan Tribe" for many years prior to the use of those terms by the defendant.
The defendant Fortin Group argues that the plaintiff's use of "Mohegan" is not protected under the common law protection of trade names. First. the plaintiff cannot establish that it made the word "Mohegan" famous in any exclusive fashion prior to the defendant corporation's use. Second, the plaintiff has failed to prove any injury stemming from the defendant corporation's rightful use of the word "Mohegan." CT Page 11675
It is a fundamental principle of the common law of trade names that "if a person enters a field under a name already in use in that field, any doubts as to the probability of confusion will be resolved against the later entrant." Paindiris v. Situni, Superior Court, J.D. of Hartford-New Britain at Hartford, Docket No. 704013 (Sept. 1, 1993) (O'Neill, J.); see also Shop-RiteDurable Supermarket v. Mott's Shop Rite, 173 Conn. 261, 268-269,377 A.2d 312 (1977); Middletown Trust Co. v. Middletown NationalBank, 110 Conn. 13, 18, 147 A. 22 (1929) (citing Daughters ofIsabella No. 1 v. National Order of the Daughters of Isabella,83 Conn. 679, 685, 78 A. 333 (1910). A trade name is not protected "until it has in fact become in the market the name for goods or services coming from or through a particular source or the name for a particular business. This special significance, once acquired, is thereafter its primary meaning in the market, though lexicographically it may have an earlier, different meaning."Shop-Rite, 173 Conn. at 266 (quoting the Restatement of Torts, § 716, comment a).
The plaintiff cannot establish that it used the word "Mohegan." exclusively prior to 1992 when the defendant the Mohegan Tribe and Nation, Inc. was incorporated.
Prior to 1992, little distinguished the plaintiff from the Fortin Group, other than the schism between Hamilton and the leadership of the plaintiff in 1970. The plaintiff and the defendants both claimed Mohegan ancestry. Both conducted cultural events that engaged in commerce. Both were, and still are, Mohegan. In fact, the entity now incorporated as the Mohegan Tribe and Nation, Inc. existed as an association of individuals led by John Hamilton, who was indisputably "a member of the Mohegan Tribe."
In 1992, the Fortin Group furthered John Hamilton's long vision of pursuing federal recognition by incorporating the Mohegan Tribe and Nation, Inc. and by filing its letter of intent to seek federal recognition with the Bureau of Indian Affairs. (See Fortin Exhibits 2 and G.) The corporation continued the long practice of the Fortin Group of identifying its Mohegan ancestry by conducting pow-wows and other cultural events as the Mohegan Tribe and Nation.
The plaintiff, on the other hand, was given the title "The Mohegan Tribe of Indians of Connecticut" when it was federally recognized in 1994. In 1996, the plaintiff began to construct and CT Page 11676 then operate the Mohegan Sun Casino. The plaintiff's promotion of the Mohegan Sun Casino is the plaintiff's first use of the term "Mohegan Tribe of Indians of Connecticut" that satisfies theShop-Rite test.
It is clear that the plaintiff cannot claim that it made the word "Mohegan" famous prior to the defendant corporation's use. The incorporators of the defendant and the group to which the incorporators belonged have been legitimately referring to themselves as Mohegans for decades. Additionally, the defendant was incorporated two years prior to the plaintiff's federal recognition and four years prior to the launching of the Mohegan Sun Casino. Since both the plaintiff and the defendants stood on equal footing as Mohegans until the groups were legally distinguished by the incorporation of the Mohegan Tribe and Nation, Inc., the plaintiff has no valid claim that its use of the word "Mohegan" predates the defendants' use.
The plaintiff further argues that the similarity of names has caused confusion. "Likelihood of confusion is the essential ingredient for claims of unfair competition under . . . the Lanham Act. Louisiana World Exposition v. Logue, 746 F.2d 1033,1039 (5th Cir. 1984).
In the present case, the name of the defendant, the Mohegan Tribe and Nation, Inc., is virtually identical to the plaintiff's recognized trade name, the Mohegan Tribe. The defendants have incorporated the entire name of the plaintiff. Clearly, any person who is looking for that sovereign American Indian Nation known as the Mohegan Tribe, for cultural/historical information, information on the annual pow-wow, employment, enrollment information, or even information on gaming or for any other purpose, is going to be confused. Any reasonable member of the public is not going to be able to differentiate the defendant from the plaintiff under these circumstances.
In regard to the defendant Confederation of the Mohegan-Pequot American Indian Nations and Affiliated Tribes, Inc., the defendant again incorporates the plaintiff's entire trade name,"Mohegan" and "Tribe." Use of both names, although couched among additional language, is going to create the impression that the defendant is involved in some fashion with the governance of the Mohegan Tribe. Trade names suggesting an association with the senior users mark constitute infringement, and constitutes evidence that the defendant is, in fact, trying CT Page 11677 to capitalize on the fame and good will associated with the plaintiff's trade name. See Home Juice Co. v. RunglinCompanies. Inc., 231 U.S.P.Q. 897, 900 (T.T.A.B. 1986 (consumers may believe, erroneously, that the two products are companion products from the same source). The reference to the defendant being a "Confederation" of "American Indian Tribes" and "Affiliated Tribes" would lead the public to believe that the defendant serves as a governmental body or an association of two of Connecticut's most well-known Indian Tribes, the Mohegan Tribe and Mashantucket Pequot Tribe with some form of authority over one or both tribes. This is patently untrue, and this deception cannot be allowed to continue.
Further, both defendants have and continue to refer to themselves as "The Mohegan Tribe and Nation," and their officers, directors, agents, employees and those associated with each organization claim to be "leaders," "Chief, "Grand Sachem" and "Tribal Council Member" of "The Mohegan Tribe and Nation" in their communications with the general public, further compounding the likelihood of confusion of the public. (Testimony of William Sears, Clayton Price, Moigu Standing Bear, Eleanor Fortin; see Pl. Exs. 20, 20a, 20b, 26, 29, 31, 33, 34, 35, 39-42, 45-53, 56, 57, 60, 61, 66-69, 73, 76 and 86. Neither defendant, nor any of their officers, directors, agents, servants, employees nor those associated with each organization, are enrolled members of the Mohegan Tribe, elected officials of the Mohegan Tribe, and have absolutely no authority to hold themselves out to the public as having any affiliation whatsoever with the plaintiff. To allow the defendants to continue to misuse the plaintiff's name in this regard would unfairly infringe on the Mohegan Tribe's right to control the use of the good will, history and culture associated with its famous name, and will continue to create the confusion that is amply demonstrated by the similarity of the names in question.
The defendants will argue that business entities in New London County have used the name "Mohegan" in their trade names, and that they should, therefore, be entitled to do so. The fact that a business entity, such as a flower shop, might use the name "Mohegan" as part of its trade name is not likely to cause confusion with the public between it and the Mohegan Tribe, a sovereign Native American Indian nation. (Exhibit 88, Norwich White Pages.) No one will approach a flower shop to obtain information on enrollment with the Mohegan Tribe, for employment with the Tribal Offices or Mohegan Sun Casino, or for cultural or CT Page 11678 historical information regarding the Mohegan Tribe. On the other hand, where a corporation/organization, such as the defendants, uses the name "Mohegan" or "Mohegan Tribe" to identify it as being an Indian tribe, seeking federal recognition as such, the likelihood that the public will be confused in distinguishing the Mohegan Tribe from the defendants is extremely great.
While proof of actual confusion is not necessary to prove likelihood of confusion; Lois Sportswear USA. Inc. v. LeviStrauss Co., 799 F.2d 867, 875 (2d Cir. 1986); it is generally considered the most persuasive proof that there is a likelihood of confusion. Three Blind Mice Designs Co., Inc. v. Cyrk. Inc.,892 F. Sup. 303, 312 (D. Mass. 1995); see Orient Express TradingCo. v. Federated Dept. Stores. Inc., 842 F.2d at 854; LouisianaWorld Exposition v. Logue, 746 F.2d at 1041. Even evidence of minimal confusion is afforded great weight. Three Blind MiceDesigns Co., supra; Louisiana World Exposition, supra; Fuji PhotoFilm Co. v. Shinohara Shoji, 754 F.2d 591, 597 (5th Cir. 1985). It has been held that proof of actual confusion requires a finding of likelihood of confusion, even in the absence of other factors. Falcon Rice Mill. Inc. v. Community Rice Mill. Inc.,725 F.2d 336, 345 (5th Cir. 1984).
The evidence introduced at trial, through the plaintiff's own witnesses as well as directly from the defendants, demonstrates that actual confusion among the public has been rampant, and continues to this day.
This evidence includes: misdirected telephone calls to both Mohegan Tribe tribal offices as well as to the defendants' offices (reverse confusion); misdirected mail (Pl. Ex. 54); confusion of Don Mallon in purchasing pow-wow ad from the defendants, believing the defendants to be Mohegan Tribe (testimony of Don Mallon) (Pl. Exs. 33-35); confusion surrounding presentation of program at Windsor School (Sandi M. Christy Johnson); identification of defendant Mohegan Tribe and Nation, Inc. as "Mohegan" on Internet site listing Native American tribe. Moigu Standing Bear, Christy and Fortin all admitted to actual confusion of the public, in that they have in the past and continue to get calls from the public seeking the Mohegan Tribe. While they testified that they directed errant calls to the Mohegan Tribe, their testimony is proof positive of actual confusion. Further, Christy Johnson's testimony regarding Windsor School is a clear example, from the defendants themselves, as to the nature of the confusion likely to occur; a school looking to CT Page 11679 the Mohegan Tribe for a presentation of Mohegan and Native American culture schedules such a program with the Mohegan Tribe, only to have the defendants appear due to last minute confusion. These instances of confusion are readily understood given the similar use of names, and especially as they appear in the telephone book. (Pl. Ex. 88).
There can be no doubt that actual confusion between the Mohegan Tribe and the defendants has occurred and is very likely to continue. Given that avoidance of such confusion is the main purpose of trademark law, the Mohegan Tribe is entitled to have the defendants enjoined from further use of the names "Mohegan" and "Mohegan Tribe" in any fashion.
VI. Discussion
After a review of the testimony and the briefs of the plaintiff and the two defendants, the court is firmly convinced that their was no violation of the Lanham Act by either defendant. This act is concerned with goods or services or any containers for goods. The defendants did not deal in any goods or product. Their activities consist of arts and crafts. The plaintiff's main activity is the operation of the Mohegan Sun Casino. The only areas of common activities suggested by any of the parties are the plaintiff's annual Wigwam Pow wow and the presentation to schools and civic organizations of Mohegan culture, history, story telling and dance. The defendants also have a "Rolling Cloud Pow-wow." The Standing Bear Group used the name "Mohegan" in its advertising for the pow-wow programs and attempted to borrow money to build a casino. They did inform the possible lender that they were not the same Mohegans as the owners of the Mohegan Sun Casino. They sell advertisements in their pow-wow programs. The evidence at trial, while showing some confusion regarding phone calls, one school presentation and one advertisement was hardly "rampant" as suggested by the plaintiff.
Under the common law, there must be not only confusion but also injury to the plaintiff's business pecuniary and otherwise for relief to be afforded. There must also be confusion so as to deceive and mislead the public. The court does not find the few instances mentioned above to be sufficient to warrant the relief requested.
In this case, the plaintiff and the defendants are not in competition. There has been no evidence that the plaintiff's CT Page 11680 business, that of operating the Mohegan Sun Casino, has been affected in any way whatsoever.
The plaintiff's claim under the Connecticut Unfair Trade Practices Act (CUTPA), Connecticut General Statutes § 42-110a, et seq. must fail, because its claim that the use of the word "Mohegan" is a violation of the act has not been proven. Also an essential element of a CUTPA claim is evidence of an ascertainable loss. There was none shown here.
While § 42-110b(a) prohibits persons from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Section42-110g(a) limits the cause of action to "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the . . . act or practice prohibited by § 42-110b." Service Road Corp. v. Ouinn, 241 Conn. 630,638 (1997).
The plaintiff has failed to prove any ascertainable loss whatsoever due to the actions of either defendant. This court must deny the CUTPA claim because the plaintiff has failed to prove, not only an ascertainable loss, but any loss or harm at all.
VII. Conclusion
Accordingly, although there was some confusion by reason of the defendants' use of the name "Mohegan," there was no financial loss of any kind to the plaintiff, nor did it demonstrate any harm to itself or its business. The court finds that the activities of the defendants pose no danger to the plaintiff, nor do they in any way interfere with the activities of the casino.
On the other hand, to forbid the defendants from using the word "Mohegan" in their activities would crush their pride and dignity in their heritage.
The court, therefore, enters judgment for the defendants and specifically denies the plaintiffs request for injunctive relief.
D. Michael Hurley Judge Trial Referee CT Page 11681